USCA1 Opinion

 

 January 22, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 92-1539 COMMONWEALTH OF MASSACHUSETTS, DEPARTMENT OF PUBLIC WELFARE, Plaintiff, Appellant, v. SECRETARY OF AGRICULTURE, ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ _________________________ Selya, Circuit Judge, _____________ Higginbotham,* Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ _________________________ Douglas H. Wilkins, Assistant Attorney General, with whom ___________________ Scott Harshbarger, Attorney General, was on brief, for appellant. _________________ Arvid E. Roach, II, with whom Virginia G. Watkin, Thomas H. ___________________ __________________ _________ Odom, and Covington & Burling were on brief, for States of ____ _____________________ Alabama, California, Florida, Georgia, Illinois, Kentucky, Louisiana, Nebraska, Ohio, Oklahoma, West Virginia and Wisconsin, amici curiae. Deborah Ruth Kant, Attorney, Civil Division, United States _________________ Department of Justice, with whom Stuart M. Gerson, Assistant _________________ Attorney General, A. John Pappalardo, United States Attorney, and __________________ Barbara C. Biddle, Attorney, Civil Division, were on brief, for _________________ appellees. _________________________ _________________________ _______________ *Of the Third Circuit, sitting by designation. SELYA, Circuit Judge. In federal fiscal year (FY) SELYA, Circuit Judge. _____________ 1982, lasting from October 1, 1981 through September 30, 1982, the Commonwealth of Massachusetts distributed food stamps far exceeding the margin of error allowable under applicable federal regulations. Consequently, Food and Nutrition Service (FNS), the branch of the United States Department of Agriculture responsible for overseeing the food stamp program, imposed a punitive sanction. Massachusetts unsuccessfully appealed the sanction to the Food Stamp Appeal Board (the Board). It then sought judicial review in federal district court. See 7 U.S.C. 2023 (1982). ___ The court granted summary judgment in favor of the defendants,1 albeit in two steps. See Massachusetts v. United States, 737 F. ___ _____________ _____________ Supp. 120 (D. Mass. 1990) (Massachusetts I); Massachusetts v. _______________ _____________ United States, 788 F. Supp. 1267 (D. Mass. 1992) (Massachusetts _____________ _____________ II). __ Finding the penalty hard to swallow, the Commonwealth serves up a gallimaufry of issues for appellate mastication. Although these issues contain some food for thought, they lack true nutritive value. Consequently, we affirm the judgment below. I. FACTUAL PRELUDE I. FACTUAL PRELUDE Congress designed the Food Stamp Act of 1964, Pub. L. ____________________ 1The Commonwealth named a host of federal defendants in its suit, including the United States, the Secretary of Agriculture, the Department of Agriculture, the Board, and FNS. For ease in reference, we treat the appeal as if the appellees were a single entity. 2 No. 88-525, 78 Stat. 103 (1964), codified as amended, 7 U.S.C. ___________________ 2011-2030 (1982), to provide low-income families with access to government-subsidized foodstuffs. Although the coupons were actually disbursed by the participating states, FNS paid fifty percent of the administrative costs and one hundred percent of the food subsidy costs. In time, the federal government's generosity produced an unfortunate side effect; because overpayments were charged to the federal tab, states had little incentive to keep distributions in line. To curb this profligacy, Congress eventually enacted a quality control program (QCP) to ensure more accurate food stamp distribution. The first QCP took effect in 1977. Pub. L. No. 95-113, 16, 91 Stat. 976 (1977). From that point forward, Congress persistently tinkered with the QCP's features. During FY 1982, the QCP required that each state survey a sample of its food stamp cases in order to estimate in what percentage of them it had distributed the wrong number of food stamps. After receiving the states' tallies, FNS would set a target error rate (the TER), take a subsample of each state's cases, recheck them for errors, and employ regression analysis to blend the federal and state estimates of state error rates into a single estimated error rate (the EER) for the state. See 7 U.S.C.A. 2025(g) (West Supp. 1981); 94 Stat. 363 (1980); ___ see also 7 C.F.R. 275.25(d)(6) (1982). If the state's EER ___ ____ surpassed the TER, as determined by FNS, the federal government 3 imposed a monetary sanction.2 Such fines were calculated by multiplying the total dollar value of state-issued food stamps for the fiscal year times the difference between the state's EER and its TER. See 7 C.F.R. 275.25(d)(3) (1982). If, however, ___ the state's EER was below five percent, the state received a bonus: the federal government increased its contribution to the program's administrative costs from fifty percent to sixty percent. See 7 C.F.R. 275.25(c)(2)(i) (1982). ___ In FY 1982, FNS set Massachusetts's TER at 14.88 percent. After the two sovereigns completed their sampling and resolved some mathematical bevues by negotiation, FNS figured the EER to be roughly 16.35 percent and, accordingly, fined the Commonwealth $1,323,864. The penalty survived scrutiny by both the Board and the district court. In this appeal, Massachusetts makes four principal claims: (1) that the quality control provisions on which the sanction rested were no longer in effect when FNS imposed the sanction; (2) that FNS's sampling methodology was so biased as to offend the Food Stamp Act; (3) that FNS's use of too large a sample skewed the results; and (4) that FNS erred in refusing to grant a good-cause waiver. We treat these asseverations in sequence. II. LACK OF STATUTORY AUTHORITY II. LACK OF STATUTORY AUTHORITY Massachusetts and the amici join in urging that FNS had ____________________ 2We discuss infra Part IV the circumstances in which the _____ imposition of a monetary sanction might be waived. 4 no authority to levy sanctions for FY 1982 because Congress repealed the QCP effective October 1, 1982. This claim stems from passage of the Omnibus Budget Reconciliation Act (OBRA), Pub. L. No. 97-253, 96 Stat. 763 (1982), enacted in September of 1982. OBRA completely revamped the Food Stamp Act's approach to quality control. The legislation repealed the previously existing QCP and fashioned a new regimen effective October 1, 1982 (the first day of FY 1983). Massachusetts contends that this legislative legerdemain undermined FNS's authority thereafter to impose sanctions for FY 1982.3 It is a hoary rule of the common law that the repeal of a statute eliminates any inchoate liability for penalties under the repealed statute. See, e.g., United States v. Reisinger, 128 ___ ____ _____________ _________ U.S. 398, 401 (1888). In order to ameliorate this rule, Congress passed a general savings statute providing in pertinent part that the "repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute . . . ." 1 U.S.C. 109 (1982). On its face, section 109 seems adequate to preserve the authority by which FNS purposed to sanction the Commonwealth. In an effort to escape the savings statute's web, Massachusetts notes that the QCP allowed waivers of liability ____________________ 3Since we can find no indication in the record that Massachusetts raised this issue before the Board, the point is at least arguably waived. But, because the issue goes to the Board's jurisdiction and because the appellees have not advanced a claim of waiver, we choose to address it, notwithstanding the possible incidence of procedural default. 5 premised on subsequent corrective measures. See, e.g., 7 C.F.R. __________ ___ ____ 275.25(d)(5) (1982). From this datum, Massachusetts deduces that it could not have "incurred" liability until such a waiver was denied an event which took place well after October 1, 1982. The court below found this argument unpersuasive. See ___ Massachusetts II, 788 F. Supp. at 1269 n.3. So do we. The mere ________________ fact that Congress grants an agent the power to waive sanctions does not turn back the clock and eradicate the reality of the underlying violation. Thus, we do not believe Congress intended that liability would be deemed "incurred" under federal law, 1 U.S.C. 109, only when all opportunities for special dispensations had been exhausted and a previously imposed penalty had become irreversible. See, e.g., Standard Oil Co. v. Federal ___ ____ ________________ _______ Energy Admin., 612 F.2d 1291, 1294 n.3 (Temp. Emer. Ct. App. ______________ 1979) (explaining why costs should be deemed "incurred" even before the amount has become certain). Rather, we think Congress intended that states incur liability for their food stamp errors at the conclusion of the six-month monitoring period, 7 U.S.C.A. 2025(g)(1) (West Supp. 1981) a period which, in this case, ended September 30, 1982. We have two main reasons for interpreting the interface between the Food Stamp Act and the savings statute in this way. In the first place, it appears well established that the savings statute was designed to prevent exactly the sort of lapse that Massachusetts argues occurred here. See, e.g., Hamm v. City of ___ ____ ____ _______ Rock Hill, 379 U.S. 306, 314 (1964) ("The federal saving statute __________ 6 . . . was meant to obviate mere technical abatement such as . . . a substitution of a new statute with a greater schedule of penalties . . . ."); United States v. Holley, 818 F.2d 351, 353 _____________ ______ (5th Cir. 1987) (similar). Reading the savings statute to release from liability any party who had not yet exhausted after- the-fact remediation would hamper the law's goal, contravene the Supreme Court's longstanding interpretation of how the statute should be applied, and encourage violators to petition willy- nilly for discretionary administrative relief in the hope that the statutory scheme might be changed betweentimes. In the second place, the statutory structure predicates waiver on precedent liability. See 7 U.S.C.A. 2025(g)(1) (West ___ Supp. 1981) (providing that, under the Food Stamp Act's liability program, an offending state shall pay the imposed fine unless the Secretary determines that good cause exists for waiver). We do not think Congress placed the cart to the horse's rear by accident. Had Congress wished waiver considerations to be part and parcel of a liability determination, it would simply have written the Food Stamp Act to premise liability on the absence of those factors that allow the granting of good-cause waivers. Congress chose to structure the statute differently, however, and we must honor its bipartite design in our interpretation. See, ___ e.g., Ingersoll-Rand Co. v. McClendon, 111 S. Ct. 478, 482 ____ ___________________ _________ (1990); Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 824 ___________________ _____________ (1st Cir. 1992), cert. denied, 61 U.S.L.W. 3478 (U.S. 1993). _____ ______ We note, too, that legislative statements surrounding 7 the 1982 repeal of the QCP, while admittedly less than pellucid, indicate no discernable intent to exonerate states for pre-1983 administrative errors. Quite the opposite: the legislative history suggests Congress intended to increase the certainty of penalties beginning with FY 1983. See S. Rep. No. 504, 97th ___ Cong., 2d Sess. 70-71, reprinted in 1982 U.S.C.C.A.N. 1641, 1708- _________ __ 09: [T]he . . . major flaw in the existing system [is that] [t]he current penalty . . . has proven difficult to apply in practice because of the relatively large amounts involved and, as a result, the Secretary has [frequently] chosen to waive its application. The sanctions established [by the new statute] . . . should not be waived except when unusual circumstances intervene. Given this purpose, it seems unlikely that Congress intended the 1982 repeal to preclude enforcement of the earlier regulations for 1981 and 1982 in instances where good-cause reviews were imminent or ongoing, but had not yet been decided. For these reasons, we reject the Commonwealth's claim that FNS lacked statutory authority to impose the sanctions in question. III. STATISTICAL METHODOLOGY III. STATISTICAL METHODOLOGY Having confirmed the vitality of the sanction provision, we turn next to the Commonwealth's double-jointed challenge to the statistical methodology that FNS employed. Before reaching Massachusetts's two substantive arguments, we think it is useful to explicate the applicable standard of judicial review. 8 A. Standard of Review. A. Standard of Review. __________________ The Food Stamp Act provides for de novo review of final __ ____ administrative determinations in the district court.4 However, this searching standard is restricted to liability determinations. See Broad St. Food Mkt., Inc. v. United States, ___ _________________________ _____________ 720 F.2d 217, 220 (1st Cir. 1983); Collazo v. United States, 668 _______ _____________ F.2d 60, 65 (1st Cir. 1981). It does not spill over to penalty determinations. See Kulkin v. Bergland, 626 F.2d 181, 184 (1st ___ ______ ________ Cir. 1980) (holding that, under the Food Stamp Act, "administrative remedies or sanctions are subject to a very limited judicial review"). A court scrutinizing administrative remedies or sanctions imposed under the Food Stamp Act may only overturn those actions that appear arbitrary, capricious, or contrary to law. See Haskell v. United States Dep't of Agric., ___ _______ ______________________________ 930 F.2d 816, 820 (10th Cir. 1991); Woodard v. United States, 725 _______ _____________ F.2d 1072, 1077-78 (6th Cir. 1984); Broad St., 720 F.2d at 219- _________ 21; Hough v. United States Dep't of Agric., 707 F.2d 866, 869 _____ ______________________________ (5th Cir. 1983); Kulkin, 626 F.2d at 184-85. ______ To be sure, both Broad St. and Kulkin involved (1) __________ ______ ____________________ 4The statute provides in pertinent part: [A] State agency . . . may obtain judicial review [of a final administrative determination] by filing a complaint against the United States in the United States court for the district in which it resides or is engaged in business . . . . The suit . . . shall be a trial de novo by the court in which the court shall determine the validity ofthe questionedadministrativeaction inissue. 7 U.S.C. 2023(a) (1982). 9 factual findings anent the culpability of food store owners who accepted food stamps as compensation for prohibited goods, and (2) determinations about what sanctions were condign, given the identities of the violators and the nature of the violations. See Broad St., 720 F.2d at 219; Kulkin, 626 F.2d at 182-83. The ___ _________ ______ question in the instant case is more complex because the two parts of the calculus liability and sanctions are imbricated: FNS's determination that Massachusetts's EER was unacceptably high essentially determined both the Commonwealth's liability and ____ the amount of the resultant sanction. See 7 C.F.R. ___ 275.25(d)(3) (1982) (explicated supra pp. 3-4). _____ Notwithstanding this conflation of liability and remediation, a reviewing court's path remains clear. Where liability is at issue, section 2023(a) requires that courts review administrative determinations de novo. If this statutory __ ____ bedrock is to endure, inexorably mixed issues of liability and sanctions must likewise be assessed de novo, even if such a __ ____ penetrating standard of judicial review intrudes to some extent into agency decisionmaking in the sanctions area. Thus, insofar as the Commonwealth's assignments of error implicate the validity of the EER and, therefore, the amount of the penalty levied, plenary review is indicated. We are quick to remark, however, that de novo review in __ ____ cases of this genre does not give courts an entirely free hand. Where, as here, the issues before the court are legal in nature, de novo review of an administrative matter does not mean that the __ ____ 10 district court must devise an entirely new regulatory scheme. Rather, in respect to liability issues, the court must ensure that the agency has followed its own regulations and that those regulations do not exceed the scope of the agency's mandate. With these precepts in mind, we now address the Commonwealth's statistical arguments.5 B. Statistical Bias. B. Statistical Bias. ________________ In order to estimate Massachusetts's food stamp error rate and thereby determine what (if any) sanction might be appropriate, FNS sampled 194 of the Commonwealth's cases for compliance. Massachusetts and the amici urge that the appellees' sampling methodology is unlawful because the risk of error inherent in FNS's approximation is not evenly shared between the state and the federal government. Because FNS's statistical method effectively determines the Commonwealth's liability as well as the amount of the sanction to be imposed, our review of the statistical bias claim is plenary. We start with the obvious: FNS's sampling is no different than any other statistical sampling in that it cannot produce results that reflect the actual error rate with unerring accuracy. Thus, whatever sampling technique is used, the EER ____________________ 5Because the court of appeals and the district court are constrained to apply exactly the same standards of judicial review in these situations, we cede no deference to the district court's views. See Lloyd v. Georgia Gulf Corp., 961 F.2d 1190, ___ _____ ___________________ 1193 (5th Cir. 1992); Terry A. Lambert Plumbing, Inc. v. Western _______________________________ _______ Sec. Bank, 934 F.2d 976, 979 (8th Cir. 1991). _________ 11 will sometimes underestimate and sometimes overestimate a state's actual error rate. Massachusetts recognizes this fact of statistical life but complains that it must foot the bill for overestimations by paying sanctions although if underestimations occur it reaps no corresponding benefit (e.g., credits that could ____ be used to offset future penalties). As a matter of pure mathematics, the Commonwealth's theory appears to hold water. Under the federal scheme, the risk of error causes the penalty provision to weigh more heavily on the states than on the federal government.6 Nonetheless, we do not see how this circumstance renders the scheme unlawful. The Food Stamp Act provides that a state is liable for "the dollar value equivalent of the State agency's payment error rate, as determined by the Secretary," to the extent it exceeds the higher of the national payment rate or the state error payment rate minus the national rate of error reduction. 7 U.S.C.A. 2025(g) (West Supp. 1981). There are a number of mechanisms by which FNS could implement this statutory directive, each with incumbent advantages and disadvantages. Massachusetts suggests that this court's right to review liability determinations de novo leaves us free to rethink the regulatory __ ____ choice among these various options. We do not agree. The power of plenary judicial review ____________________ 6Of course, the states profit from a similar bias when FNS awards bonuses for lower error rates. In that instance, the federal government bears the cost of underestimating state error rates but gains no offsetting advantage from overestimates. 12 does not obviate the devoir of persuasion in a food stamp case in which a plaintiff challenges the validity of the regulatory mosaic. See Kulkin, 626 F.2d at 183. To carry its burden, the ___ ______ plaintiff must still show that the federal agency exceeded its statutory or constitutional authority. An attempt to make such a showing must frankly recognize that the art of regulation involves line-drawing. When Congress entrusts an agency with the responsibility for drawing lines, and the agency exercises that authority in a reasonable way, neither the fact that there are other possible places at which the line could be drawn nor the fact that the administrative scheme might occasionally operate unfairly from a particular participant's perspective is sufficient, standing alone, to undermine the scheme's legality. See Knebel v. Hein, 429 U.S. 288, 294 (1977) (holding that the ___ ______ ____ availability of more equitable food stamp regulations does not render the Secretary's particular regulatory scheme invalid); Louisiana v. Black, 694 F.2d 430, 431-32 (5th Cir. 1982) (same); _________ _____ see also Chevron U.S.A. Inc. v. Natural Resources Defense ___ ____ _____________________ ___________________________ Council, Inc., 467 U.S. 837, 843 n.11 (1984) ("The court need not _____________ conclude that the agency construction was the only one it permissibly could have adopted . . . to uphold [it] . . . .") (collecting cases); Mourning v. Family Publications Serv., Inc., ________ _______________________________ 411 U.S. 356, 371 (1973) ("That some other remedial provision might be preferable is irrelevant."). In other words, so long as the administrative scheme is a valid exercise of the agency's _____ authority, whether or not a perfect exercise of that authority, _______ 13 the courts must honor it. See Sprandel v. Secretary of HHS, 838 ___ ________ _________________ F.2d 23, 27 (1st Cir. 1988) (per curiam) (observing that where administrative line-drawing is involved, "there are no perfect solutions"). These principles are dispositive here. Massachusetts argues, in effect, that a system of credits and debits for each state would be preferable to, and fairer than, the statistical methodology selected by FNS. Whether or not this is so, the Commonwealth has not demonstrated that the system selected by FNS is an irrational one, that it is arbitrarily conceived, that it is profoundly flawed, or that it operates in a wholly capricious manner. Congress directed that the error rate was to be "determined by the Secretary," 7 U.S.C.A. 2025(g) (West Supp. 1981), and the Secretary implemented this directive through the application of what all parties agree is routine statistical sampling. The enabling statute itself sets out the arithmetic mechanism for determining the sanction, given the error rate; the Secretary has followed this command, albeit without refining his statistical estimates. The Secretary might, as Massachusetts advocates, have installed a more intricate and sensitive statistical system, but doing so would not necessarily have represented an improvement. The proposed alternatives would by all accounts be more complicated to administer and could well prove less of a deterrent to administrative errors. In terms of our analogy, the line drawn by FNS, as the Secretary's designee, seems to have been plotted sensibly, if not 14 with perfect precision; that is, FNS chose a configuration consistent with statutory imperatives and well within the universe of plausible approaches. Because the administrative scheme did not exceed the agency's statutory discretion, summary judgment was properly granted on this issue. See Valley Citizens ___ _______________ for a Safe Env't v. Aldridge, 886 F.2d 458, 469 (1st Cir. 1989) _________________ ________ (finding that reasonableness of agency action supported summary judgment); Kulkin, 626 F.2d at 183 (upholding summary judgment ______ where the disputed facts were immaterial to the plaintiff's ultimate burden at trial). C. Oversampling. C. Oversampling. ____________ The Commonwealth also asserts that FNS violated its own regulations when it took a subsample comprised of 194 food stamp cases (as opposed to the 180 cases specified in 7 C.F.R. 275.3(c)(1) (1982)). The district court, while noting that Massachusetts had not raised the issue before the Board, see ___ Massachusetts I, 737 F. Supp. at 122 n.3, reached the merits and _______________ ruled that the regulations, while mentioning 180 cases, did not set a maximum subsample size. Id. at 127. For our part, we see ___ no reason to delve behind the Commonwealth's procedural default.7 Accordingly, we hold that Massachusetts, by ____________________ 7Our inquiry into procedural default has been hindered by the Commonwealth's failure to follow Fed. R. App. P. 30(d) and include an index in its appendix of excerpts from the administrative record. This failure is exacerbated by other shortcomings in the main appendix: various pages are missing, illegible, and/or out of sequence. It is, of course, an appellant's obligation "to provide this court with an appendix sufficient to support its points on appeal." United States v. _____________ One Motor Yacht Named Mercury, 527 F.2d 1112, 1113 (1st Cir. _______________________________ 15 neglecting to raise this claim before the Board, waived any right to object to the sample size.8 In the usual administrative law case, a court ought not to consider points which were not seasonably raised before the agency. See United States v. L. A. Tucker Truck Lines, Inc., 344 ___ _____________ ______________________________ U.S. 33, 37 (1952) (discussing the "general rule that courts should not topple over administrative decisions unless the administrative body . . . has erred against objection made at the time appropriate under its practice"); Khalaf v. Immigration & ______ _____________ Naturalization Serv., 909 F.2d 589, 592 (1st Cir. 1990) _____________________ (explaining that issues not raised before an administrative appeal board cannot be adjudicated in the course of judicial review); Removatron Int'l Corp. v. FTC, 884 F.2d 1489, 1493-94 _______________________ ___ (1st Cir. 1989); Colin K. v. Schmidt, 715 F.2d 1, 5-6 (1st Cir. ________ _______ 1983). The doctrine of procedural default in the administrative context is analogous to the established rule that appellate courts will not entertain arguments which could have ____________________ 1975). When, as now, an appellant shirks this duty, it must bear the onus of any insufficiencies in the record on appeal, including inadequacies in the appendix. 8The parties have characterized the Commonwealth's failure to raise the oversampling issue as an "exhaustion" problem. We do not view it in that light. Administrative exhaustion and waiver can be concurrent concepts at times, see IV Kenneth C. ___ Davis, Administrative Law Treatise 26:7 (1983), but they are ____________________________ not synonymous here. Because the Board's decision was final and reviewable by the district court, we believe that Massachusetts exhausted its administrative remedies. See, e.g., Athehortua- ___ ____ ___________ Vanegas v. Immigration & Naturalization Serv., 876 F.2d 238, 240 _______ __________________________________ (1st Cir. 1989). 16 been, but were not, raised in the trial court. See, e.g., ___ ____ Clauson v. Smith, 823 F.2d 660, 666 (1st Cir. 1987) (collecting _______ _____ cases). As in the trial court/appellate court analogy, requiring parties to develop their arguments in the administrative setting before seeking judicial review serves several salutary purposes. We list three such purposes that have direct bearing in this instance. First, when the administrative agency is given an opportunity to address a party's objections, it can apply its expertise, exercise its informed discretion, and create a more finely tuned record for judicial review. By way of illustration, if Massachusetts had appropriately raised the oversampling issue in this case, we would now have the benefit of both the Board's interpretation of the applicable regulations and its expert opinion concerning the ultimate effect of the augmented sample size. Though different administrative conclusions deserve different degrees of deference, it is essential to the proper development of administrative law that courts exercise their function of judicial review on a well-rounded record. See McKart ___ ______ v. United States, 395 U.S. 185, 194 (1969); see also Valley ______________ ___ ____ ______ Citizens, 886 F.2d at 469 (observing that "the place to attack ________ standard methodology, at least in the first instance, is before the agency, not before a reviewing court"). A second reason for applying strict rules of procedural default in the administrative context is to promote judicial economy. A claim seasonably presented to the appropriate 17 administrative body has an appreciable chance of being put to rest, or at least narrowed, before it depletes the heavily burdened resources of the federal courts. Massachusetts, the amici, and the court below all relate previous instances where there were problems with sample sizes and, consequently, the Board overturned FNS sanctions. See, e.g., Massachusetts I, 737 ___ ____ _______________ F. Supp. at 122. Thus, raising the issue before the Board might well have led to its resolution, once and for all. Finally, enforcing procedural default solidifies the agency's autonomy by allowing it the opportunity to monitor its own mistakes and by ensuring that regulated parties do not simply turn to the courts as a tribunal of first resort. A double whammy would result if Article III judges encouraged such end runs by demonstrating a willingness to hear all challenges to regulatory action regardless of whether the parties raised those challenges before the affected agency: power would drain from the agencies and administrative appeals would flood the federal courts. To be sure, there are exceptional circumstances under which a court might dispense with the raise-or-waive rule in the administrative law context. Cf., e.g., United States v. La ___ ____ ______________ __ Guardia, 902 F.2d 1010, 1012-13 (1st Cir. 1990) (explaining why, _______ in a criminal case, the court of appeals would exercise its discretion to review a particular constitutional claim that had not been raised in the trial court). As a general matter, however, courts will not entertain an issue that the parties 18 failed to raise in the proper administrative venue unless the issue is jurisdictional in nature or some other compelling reason exists. See Tucker Truck Lines, 344 U.S. at 38; Rana v. United ___ __________________ ____ ______ States, 812 F.2d 887, 889-90 & n.2 (4th Cir. 1987). The ______ Commonwealth tenders no such justification here. Whether FNS appropriately followed its own regulations in regard to sampling, and the effect and consequences of any failure to do so, are matters which in no way implicate jurisdictional concerns. On the contrary, they present the sort of problems routinely within the Board's purview and at the heart of its expertise. The Commonwealth has advanced no palatable excuse for failing to raise the oversampling issue at the proper time and in the proper forum. Under these circumstances, we cannot justify any relaxation of the customary rule. The Commonwealth waived the oversampling issue.9 IV. GOOD-CAUSE WAIVERS IV. GOOD-CAUSE WAIVERS Massachusetts argues that it was entitled to a good- cause waiver as a matter of right and that the district court erred in summarily rejecting its beseechment. We do not agree. Unlike questions of statistical propriety, see supra ___ _____ Part III, the matter of a good-cause waiver is not imbricated ____________________ 9Incident to this procedural default is the Commonwealth's quest for reversal on the ground of inconsistent administrative positions. But here, the Commonwealth is hoist with its own petard. It did not bring the oversampling issue before the Board, thus depriving the Board of the chance to explore the issue in a zoetic context informed by both case-specific facts and administrative precedents. Because we cannot judge the Board's consistency on an issue it did not adjudicate, we deem this related claim to be waived as well. 19 with a fundamental determination of liability but relates solely to FNS's determination of the appropriate sanction. Thus, the Food Stamp Act's provision for de novo review of liability __ ____ findings does not apply.10 Instead, we review the waiver denial to see whether it was arbitrary, capricious, or contrary to law. Broad St., 720 F.2d at 220; Kulkin, 626 F.2d at 184. In _________ ______ so doing, we recognize that an administrative agency enjoys great latitude to interpret its own rules as long as those interpretations are reasonable. See Martin v. Occupational ___ ______ ____________ Safety & Health Rev. Comm'n, 111 S. Ct. 1170, 1175-76 (1991) _____________________________ (explaining that an "agency's construction of its own regulations is entitled to substantial deference") (quoting Lyng v. Payne, ____ _____ 476 U.S. 926, 939 (1986)); accord Udall v. Tallman, 380 U.S. 1, ______ _____ _______ 16-17 (1965); Federal Labor Relations Auth. v. United States _______________________________ ______________ Dep't of the Navy, 941 F.2d 49, 59 (1st Cir. 1991); Dunn v. ___________________ ____ Secretary of United States Dep't of Agric., 921 F.2d 365, 366-67, __________________________________________ 369 (1st Cir. 1990). ____________________ 10Indeed, the legislative history reveals that Congress explicitly rejected the de novo judicial review that __ ____ Massachusetts would have us indulge on this issue: Every State against which the Secretary asserted a claim would have the right to seek administrative and judicial review of the claim in accordance with the procedures contained in section 14 of the Act. None of these procedures would be applicable to the Secretary's review of the State's contention that it had good cause for its failure to meet the appropriate level of error. H.R. Rep. No. 788, 96th Cong., 2d Sess. 74 (1980), reprinted in _________ __ 1980 U.S.C.C.A.N. 843, 907. 20 It is in the Secretary's realm to grant or deny a good- cause waiver.11 See 7 U.S.C.A. 2025(g) (West Supp. 1981). ___ To obtain such a waiver, a state must show, at a bare minimum, that one of the following events occurred: (1) natural disasters, civil disorders, labor unrest, or other circumstances beyond the state's control, adversely affecting program operations; (2) significant caseload growth; (3) legislative changes adversely affecting program management; (4) misapplication of federal policy with erroneous approval from FNS; or (5) exemplary efforts to reduce the error rate. See 7 ___ C.F.R. 275.25(d)(5)(A)-(G). Whereas a threshold showing along these lines may qualify a state for a good-cause waiver, the Secretary can still deny the waiver if he finds the state's showing insufficient either because other factors overshadow the applicant's compendium of exculpatory factors or because a particular event or events listed by the applicant cannot withstand objective scrutiny.12 Id. ___ Massachusetts sought a good-cause waiver on three grounds, viz., caseload growth, changes in federal laws, and good ____________________ 11The Secretary has delegated this power to FNS. See 7 ___ C.F.R. 275.25(d)(5) (1982). 12The regulations also provide for an "automatic" waiver in certain limited circumstances. See 7 C.F.R. 275.25(d)(5)(G) ___ (1982). In order to receive such a waiver, a state must have implemented an FNS-approved corrective action program in the six months before the period during which the excessive error rate materialized, and must meet specially reduced target error rates thereafter. The record does not indicate that Massachusetts ever claimed eligibility for an automatic waiver applicable to FY 1982. 21 faith efforts to reduce its error rate. FNS denied the waiver. In so doing, it took much of the wind from Massachusetts's sails. Specifically, FNS explained that Massachusetts's caseload growth was not a sufficient excusatory fact because the figure was bloated by one-time social security "cash-ins"; that new legislation was not a factor because the state had four months to adapt to changes in the law; and that Massachusetts's efforts to reduce errors were anything but "exemplary." Additionally, FNS brought an independent set of considerations to bear, stressing the Commonwealth's steady history of failing to meet program deadlines and requirements. The Board approved the agency's decision to withhold a waiver on this ground and the district court affirmed by summary judgment. Massachusetts and FNS attempt to rejoin this point- counterpoint before us. Our role in this setting, however, is not to weigh the factual averments and assess, on balance, the merits of a waiver. Rather, "[i]f the court upholds the agency's finding of violation, the court's only remaining task is to examine the sanction imposed in light of the administrative record to judge whether the agency properly applied its regulations . . . ." Broad St., 720 F.2d at 220. In fine, a _________ reviewing court may only overturn agency sanction determinations that are arbitrary and capricious, see id., which is to say, ___ ___ "unwarranted in law . . . or without justification in fact." Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185-86 (1973) ____ ___________________________ (citation omitted); accord Collazo, 668 F.2d at 65. ______ _______ 22 In the posture of this case, the idiosyncratic nature of summary judgment practice gives a slightly different twist to the operation of the familiar "arbitrary-and-capricious" standard. Because we are scrutinizing the district court's disposition of a motion filed under Fed. R. Civ. P. 56(c), we must approach the record "in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 ___________ _____ F.2d 112, 115 (1st Cir. 1990). In order to prevail, therefore, the Commonwealth must persuade us that the record evinces a genuine dispute over some material fact. Emphasizing the items set forth in support of its waiver application, Massachusetts says that such a dispute existed. But, this perspective overlooks the relevant point: the real question is not whether the facts set forth in support of the waiver application are disputed, but, rather, whether the administrative record, now closed, reflects a sufficient dispute concerning the factual predicate on which FNS relied in denying the waiver to support a finding that the agency acted arbitrarily or capriciously. We explain briefly. On a motion for summary judgment, a fact is material if it "might affect the outcome of the suit under the governing law"; a dispute is "genuine" if a reasonable jury could resolve it in favor of the nonmoving party. United States v. One Parcel _____________ __________ of Real Property, Etc., 960 F.2d 200, 204 (1st Cir. 1992) (citing ______________________ Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). ________ ____________________ 23 Because the law allows FNS to exercise discretion as long as it has minimally adequate justification in fact for doing so, the facts material to the propriety of summary judgment on the good- cause waiver question are those facts that relate to whether FNS's denial of the waiver was arbitrary and capricious not the facts on which a plea for issuance of a waiver might have rested. See Villanueva v. Wellesley College, 930 F.2d 124, 129 (1st Cir.) ___ __________ _________________ (noting that an appellate tribunal must review summary judgment in light of the plaintiff's ultimate burden at trial), cert. _____ denied, 112 S. Ct. 181 (1991). In a nutshell, then, a bona fide ______ skirmish over the veracity and importance of ancillary facts which the Commonwealth thinks support its waiver application does not egest the possibility of summary judgment, for it is the basis underlying the agency's denial of a waiver upon which a reviewing court must focus. See Town of Norfolk v. United States ___ _______________ _____________ Army Corps of Eng'rs, 968 F.2d 1438, 1448 (1st Cir. 1992) _______________________ (upholding a grant of summary judgment on the basis that, if an agency determination is "reasonably supported by the administrative record, [a reviewing court's] inquiry must end"); see also Villanueva, 930 F.2d at 131 (ruling that summary ___ ____ __________ judgment is proper when a plaintiff disputes some facts, but does not adduce sufficient evidence from which the trier could conclude that the defendant failed to meet the applicable legal standard). The district court noted that the facts upon which the Commonwealth relied, "though qualifying it for consideration for 24 a waiver, and indeed possibly warranting a waiver, [did] not entitle it to a waiver as a matter of right." Massachusetts II, ________________ 788 F. Supp. at 1275. We agree with this assessment. We add, moreover, that, as this court has recognized for many years, simply rearguing the merits of an agency's discretionary decision will not forestall summary judgment on such an issue. See, e.g., ___ ____ Concerned Citizens on I-190 v. Secretary of Transp., 641 F.2d 1, ____________________________ ____________________ 7 (1st Cir. 1981). Although we, like the district court, assume for argument's sake that the subsidiary facts on which the Commonwealth's waiver application rested are true, the record nevertheless reveals that FNS weighed these facts against, and eventually based its denial on, other uncontested facts (e.g., ____ the contribution of Social Security "cash-ins" to caseload growth, the superior performance of other states under much the same circumstances, and Massachusetts's checkered history of noncompliance with food stamp program directives). Regarding this latter set of subsidiary facts, there is no dispute. See ___ Massachusetts II, 788 F. Supp. at 1274. ________________ Let us be perfectly clear. We do not suggest that courts should rubber-stamp agency decisions under the guise of "arbitrary-and-capricious" review. Had FNS, in this case, rejected the waiver application on a ground that its regulations did not contemplate, or without considering the applicant's stated basis for relief, or in reliance on a manifestly inadequate factual showing, there might well be room for a court to find the agency's actions arbitrary and capricious. But, 25 nothing of the kind transpired here. Rather, the record reveals a situation in which FNS carefully considered the whole and declined rationally, if not inevitably to grant discretionary relief. In the final analysis, Congress elected to delegate the discretion to award or withhold good-cause waivers of food stamp penalties to the Secretary not to the federal courts. Where, as here, the legislature has conferred generous discretion upon an agency, a reviewing court must contemplate the administrative record with due regard for that discretion and gauge the reasonableness of agency action in that light. Given the low quantum of factual justification necessary to deny a discretionary waiver under section 2025(g), we are constrained to conclude that, since FNS's denial of the waiver was based upon a plausible and essentially uncontested set of reasons documented in the record and consistent with existing regulations, the district court correctly ruled in its favor, notwithstanding that the case was at the summary judgment stage. See Valley Citizens, ___ _______________ 886 F.2d at 469; see also Citizens to Preserve Overton Park, Inc. ___ ____ _______________________________________ v. Volpe, 401 U.S. 402, 416 (1971) ("The Court is not empowered _____ to substitute its judgment for that of the agency."). V. CONCLUSION V. CONCLUSION We need go no further. The Commonwealth's asseverational array announces an abundance of red meat and strong drink; yet, its table is spread with far less hearty fare. Because appellant's arguments afford scant sustenance for its 26 position, the disputed sanction must stand. On the record before it, the district court did not err in entering summary judgment in favor of the Secretary. Affirmed. Affirmed ________ 27