**COMMONWEALTH OF MASSACHU-SETTS, and Massachusetts Department of Public Welfare, Plaintiffs,**

**v.**

**UNITED STATES of America, United States Secretary of Agriculture, Massachusetts State Board of Food Appeals, and United States Department of Food & Nutrition Service, Defendants.**

**Civ. A. No. 86-2132-Y.**

United States District Court, D. Massachusetts.

April 6, 1992.

1268

Douglas H. Wilkins, Asst. Atty. Gen., Boston, Mass., for plaintiffs.

Jeffrey Martin, Asst. U.S. Atty., Steven Zelinger, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

The Commonwealth of Massachusetts appeals from a determination by the Food Stamps Appeals Board ("Appeals Board") that Food and Nutrition Services ("Food and Nutrition"), the administrator of the food stamps program,[1] properly levied sanctions totalling $1,323,864 for violations from April to September 1982 of the Food Stamp Act of 1964 ("the Act"), 7 U.S.C.

---

1. Food and Nutrition Services is the delegated administrator of the food stamps program, pursuant to the Secretary of Agriculture's power to

delegate responsibility under 7 U.S.C. § 2013 (1988).

§§ 2011–2030. The parties have filed cross-motions for summary judgment on the validity of the agency action. The Commonwealth additionally seeks judgment that it is entitled to a "good cause" penalty waiver.[2]

■ The Commonwealth agrees that the mathematical computations involved comply with the applicable regulations, but it argues that the regulations themselves are biased against states in their choice of a sampling-type computation method.[3] The Appeals Board affirmed the validity of the sanctions, finding that the sampling methods were "consistent with currently recognized approaches outlined in statistical texts and practices used in other governmental programs." *See* Letter from Orval Kerchner to Michael Putnam ("Kerchner Letter") at 1978. The Appeals Board ruled that the denial of a "good cause" penalty waiver was also proper, because Massachusetts did not exhibit any "exemplary effort" to reduce its error rate. *Id.* at 1979.

### I. The Food Stamp Act of 1964

Congress, in an attempt to supplement the nutritional needs of low income families and "[t]o alleviate ... hunger and malnutrition," 7 U.S.C. § 2011, enacted the Food Stamp Act of 1964. The Act provides for food stamp distribution to eligible families in order to increase their food purchasing power. The Secretary of Agriculture was empowered to formulate regulations consistent with the Act, including uniform eligibility requirements. 7 U.S.C. § 2013(c). The Secretary delegated nation-wide supervision of the program to Food and Nutri-

tion. The states that choose to participate in the plan are required to designate an agency responsible for day-to-day operations. *See* 7 C.F.R. § 272.2 (1990). In Massachusetts, the Department of Public Welfare ("the Department") administers the food stamp program. The Commonwealth and the federal government share the administrative costs equally. *See* 7 U.S.C. § 2025(a).

### A. Error Rates

In order to verify state compliance with the program, the federal government imposes a target error rate each year. The target error rate provides a margin for error within which there is no liability for administrative errors. If the official error rate exceeds the target error rate, then liability results. Indeed, the federal government is empowered to reduce food stamp funding by five percent for every percentage point by which the official error rate exceeds the range of the target error rate. 7 C.F.R. § 275.23(d)(3)(i) (1991). Any over-issuance of food stamps, either an issuance to ineligible households or an issuance of excessive amounts to eligible households, results in liability.

Rather than compile actual percentages based on the Department's distribution to individual households, Food and Nutrition uses a "sampling method" in which a cross-section or sub-sample of the households is evaluated in order to determine the official or actual error rate. 7 C.F.R. § 275.10–11. First, the state determines its own official error rate using a statistical sample, then Food and Nutrition chooses a sub-sample

---

**2.** This Court, in its Memorandum and Order of April 27, 1990, denied the motion of the Commonwealth for summary judgment against the imposition of the penalty and granted the cross motion of the United States for partial summary judgment, thus disposing of one of the defenses raised against the imposition of the penalty. *Commonwealth of Mass. v. United States,* 737 F.Supp. 120, 126 (D.Mass.1990). This opinion addresses the remaining issues.

**3.** The Commonwealth challenges the authority of Food and Nutrition to levy sanctions, based on the Food Stamp Act Amendments of 1982, Pub.L. 97–253, which repealed old section (g)

and replaced it with a new section. This argument is without basis in law. The General Savings Clause, 1 U.S.C. § 109 (1985), requires that penalties assessed on a repealed or amended statute remain in effect unless the repealing act provides otherwise. *See Moorehead v. Hunter,* 198 F.2d 52, 53–54 (10th Cir.1952); *United States v. Taylor,* 123 F.Supp. 920, 923 (S.D.N.Y. 1954), *aff'd* 227 F.2d 958 (2d Cir.1955), *cert. denied,* 353 U.S. 961, 77 S.Ct. 870, 1 L.Ed.2d 912 (1957); *In re Joshua Slocum, Ltd.,* 103 B.R. 610 (E.D.Pa.1989). Since October 1, 1982, was the effective date of the 1982 Amendments, penalties arising under old section (g) remained effective.

from the state's larger sample and reviews the official error rate.

The target rate computation is set out in 7 C.F.R. § 275.23(e)(2). For 1983 and subsequent years, the regulations enumerate the target error rates. For the relevant period—April to September of 1982—however, the regulations provided a choice between two formulae for calculating the target error rate. These are the higher of either the national standard payment error rate during the first-half of 1981 or the state's actual payment error rate for the same period, with a mathematical allowance factored in. The parties do not dispute that the computed target error rate for the base period was 14.88 percent.[4]

Massachusetts' official payment error rate for the period was 16.35, exceeding the target rate by 1.47 percent.[5] Food and Nutrition assessed the penalty for the period at $1,323,864. The Commonwealth does not dispute that Food and Nutrition accurately computed the penalty based on the regulations promulgated by the Secretary. Instead, Massachusetts calls into question the validity of the regulations themselves as biased in favor of the federal government and against the states.

### B. Standard of Review

■ This Court is called upon to review the Appeals Board's approval of the action taken by Food and Nutrition. Pursuant to 7 U.S.C. § 2023, the Commonwealth is entitled to a trial *de novo* before this Court to review the actions of the Appeals Board.[6] The Court is not limited to reviewing the record presented to the Appeals Board; the Court must examine all evidence and make its own findings of fact and conclusions of law. *Modica v. United States*, 518 F.2d 374, 376 (5th Cir.1975); *Ramirez v. United States*, 514 F.Supp. 759, 763 (D.P.R.1981). *See also Dunn v. Secretary of U.S. Dep't of Agric.*, 921 F.2d 365, 366 (1st Cir.1990), citing *New England Legal Found. v. Massachusetts Port Auth.*, 883 F.2d 157, 167 (1st Cir.1989). This Court cannot, however, simply ignore the findings of the Appeals Board. *Kulkin v. Bergland*, 626 F.2d 181, 185 (1st Cir.1980) ("We think that the *de novo* judicial review provision, a procedure for determining facts, is not aimed at displacing the agency's role"); *see also Redmond v. United States*, 507 F.2d 1007, 1011 (5th Cir.1975).

■ The First Circuit has adopted a bifurcated standard of review in food stamp cases, applying a *de novo* standard to the determination of the violation and a limited administrative review standard to the sanction imposed. *See e.g., Kulkin*, 626 F.2d at 184; *Broad St. Food Mkt., Inc. v. United States*, 720 F.2d 217, 220 (1st Cir.1983). In *Broad St.*, for example, the First Circuit explained that review of the imposition of sanctions takes place under the "arbitrary and capricious" standard germane to the Administrative Procedure Act, 5 U.S.C. §§ 701—706, while review of agency fact finding takes place under a *de novo* standard. In that case, Food and Nutrition had suspended the food stamps program at a market for one year. The market did not challenge the finding of violations, but, on *de novo* review, it submitted new evidence that the sanction of disqualification was onerous to the surrounding community. The federal govern-

---

**4.** The rate shifted from 14.86 to 14.88 in order to reflect a change in the base period rate. Maddox Affidavit ¶ 19.

**5.** Again, the official error rate was adjusted several times in order to account for incomplete samples. The initial official error rate was 16.36 percent on November 8, 1984; 16.62 percent on November 21, 1984; 16.38 percent on February 24, 1986; and finally, 16.35 percent on April 11, 1986. These adjustments reflected changes in status from complete to incomplete cases of some sample households. *See* Declaration of Janice Austin ¶¶ 13–21.

**6.** In pertinent part, 7 U.S.C. § 2023(a) provides:

> The suit in the United States district court or State court shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue. If the court determines that such administrative action is invalid, it shall enter such judgment or order as it determines is in accordance with the law and the evidence. During the pendency of such judicial review, or any appeal therefrom, the administrative action under review shall be and remain in full force and effect.

ment objected to the new evidence. New evidence, the First Circuit held, is generally admissible in a *de novo* review, but the District Court had overstepped its bounds by examining new evidence regarding the choice of sanction. The sanction review [7] was limited to an examination of "the sanction imposed in light of the administrative record to judge whether the agency properly applied its regulations." *Broad St.*, 720 F.2d at 220. This is the standard imposed by the Administrative Procedure Act and espoused by the Supreme Court in *Butz v. Glover Livestock Comm. Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973). *See also Kulkin*, 626 F.2d at 184–85 (adopting the *Butz* standard for review of assessed sanctions).

This bifurcated approach gives appropriate controlling weight to the discretion of the administrative agency in choosing a sanction. *Broad St.*, 720 F.2d at 220 (quoting *Kulkin*, 626 F.2d at 184 [choice of sanction is "peculiarly a matter for administrative competence" and may be overturned only if it results from "arbitrary or capricious" agency action or is "unwarranted in law and in fact"]). Moreover, the Act's legislative history supports this bifurcated approach. *See* H.R.Rep. No. 464, 95th Cong., 1st Sess. 397–98, *reprinted in* 1977 U.S.C.C.A.N. 1705, 1978, 2326–27 ("The trial *de novo* as set forth in [7 U.S.C. § 2023] should be limited to a determination of the validity of the administrative action, but not of the severity of the sanction. Review of the factual determination is normal grist for the courts; review of the length of highly discretionary a [sic] sentence of disqualification is not").

■ If the sanction is not warranted in law or fact, or if the Department of Agri-

culture acted in an "arbitrary and capricious" manner in imposing sanctions, this Court may reduce the penalty or instruct the agency to review the penalty. 7 U.S.C. § 2025(a); *see also Broad St.*, 720 F.2d at 220. Summary judgment is an appropriate remedy if no genuine issues of material fact exist for trial. *Modica*, 518 F.2d at 376.

### C. The Sampling Method and Penalty Bias

■ The stratified sampling method employed by Food and Nutrition is a reasonable and efficient method for determining the official error rate. *See* Hansen and Tepping Joint Declaration ¶ 16.[8] Though alternative methods exist, the two defense experts hail the Food and Nutrition choice [9] as having a statistical advantage over other methods. *Id.* It is undisputed, though, that some bias against the states does arise from the use of the stratified sampling method. The experts disagree on the impact that the bias has upon state liability levels. Hansen and Tepping describe the bias as "trivial," although in Massachusetts the bias represents 0.15 percent of federal administrative costs or 9.8 percent of the assessed liability. *Id.* at ¶¶ 10, 11. The Commonwealth proffers the affidavit of Dr. William Fairley, prepared for similar litigation in the state of Utah. *See In re Utah Dep't of Social Serv.*, Administrative Review No. 9–87. Dr. Fairley explains that "imprecise estimates" are germane to the statistical sampling method, and a combination of sampling and measurement variations creates a "penalty bias" that favors the federal government. Fairley Affidavit at 5. This bias is aggravated, he says, by an extreme value bias that results when

---

7. Generally, discussion of the severity of the sanction or the type of sanction employed is impermissible. *See Broad St.*, 720 F.2d at 220, rejecting Fourth Circuit reasoning in *Cross v. United States*, 512 F.2d 1212, 1218 (4th Cir.1975) (en banc).

8. Mr. Hansen is now deceased, so arguably his affidavit, although in standard form for consideration upon a motion for summary judgment, is now inadmissible hearsay. Fed.R.Evid. 802. The United States, however, represents that Mr. Tepping is capable of defending the Joint Decla-

ration and further asserts that the declaration is admissible because it was made in good faith and based upon personal knowledge of the declarant Hansen. The Court need not address this latter assertion since Mr. Tepping is a competent witness regarding the matters covered in the joint declaration.

9. "The choice [of statistical method] is a matter of policy rather than statistical theory...." Joint Declaration ¶ 14.

variable estimates from different universes are compared, such as when mid-season baseball averages are compared with season-long averages. *Id.* at 15.

The bias could be alleviated in several ways, Dr. Fairley asserts. The federal government could: (1) allow credit in a year in which the state remains within its target error rate, thereby equalizing the effect of a penalty year against a credit year; (2) average error rates over time; (3) increase sampling sizes; or (4) use a lower level "confidence interval," which estimates a range within which the true error rate falls, rather than the currently used "point interval," which estimates the error rate from the sampling method. Fairley Affidavit at 10; *see also* Tepping Declaration ¶ 14. In short, Dr. Fairley suggests using a true value methodology, rather than a stratified sampling method. Dr. Tepping, in a second affidavit, discounts the alternative methods proposed, pointing out that while they may reduce the bias, they do not eliminate it and, indeed, may merely shift the bias to the federal government. Tepping Declaration ¶ 5.

The Appeals Board reasoned that the sampling methods were "consistent with currently recognized approaches outlined in statistical texts and practices used in other governmental programs." Kerchner Letter at 1978. The basic methodology employed by Food and Nutrition "involves acceptable statistical procedures and is consistent with Federal regulations." *Id.* at 1979. This Court agrees.

■ The Court's duty is to review agency action and to enforce the Congressional mandate with which both this Court and the agency must comply. *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Only an agency interpretation that directly conflicts with the statute is invalid. Regulations are thus given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782. Here, Congress conferred broad powers of construction upon the Secretary to implement the food stamp program:

> The Secretary shall issue such regulations consistent with this chapter as the Secretary deems necessary or appropriate for the effective and efficient administration of the food stamp program and shall promulgate all such regulations in accordance with ... section 553 of Title 5. In addition, prior to issuing any regulation, the Secretary shall provide the Committee of Agriculture of the House of Representatives and the Committee of Agriculture, Nutrition, and Forestry of the Senate a copy of the regulation with a detailed statement for justifying it.

7 U.S.C. § 2013(c).

■ This language permits wide latitude in devising regulations that promote the overall purpose of the Act. *Knebel v. Hein*, 429 U.S. 288, 293, 97 S.Ct. 549, 553, 50 L.Ed.2d 485 (1977). This latitude limits judicial review to determining whether the Secretary reasonably exercised his statutory power in promulgating the regulations. *Id.* at 294 n. 14, 295, 97 S.Ct. at 553 n. 14, 554. The low threshold requirement for upholding agency action is simply a rational basis between the agency regulation and the Act's purpose. *Id.* at 296, 97 S.Ct. at 554; *see also Commonwealth v. Yeutter*, 756 F.Supp. 48, 52 (D.Mass.), *aff'd*, 947 F.2d 537 (1st Cir.1991). The Secretary exercises a range of discretion in the choices he makes when he administers the food stamp program. Thus, the existence of arguably more equitable alternatives is unimportant in the analysis; Congress empowered the Secretary to administer the program, and the courts cannot second-guess his policy choices. *Knebel*, 429 U.S. at 294 n. 14, 97 S.Ct. at 553 n. 14 (food stamp regulations limiting deductions to certain types of expenses were valid, even though somewhat unfair, as valid exercise of the Secretary's power); *see also Hettleman v. Bergland*, 642 F.2d 63, 66 (4th Cir.1981).

Applying these principles, this Court need not address the efficiency or fairness of the proposed alternative methods. Doctors Tepping and Hansen have established

the efficiency of the sampling method in determining the official error rates and the ensuing liability. This Court must defer to the discretion exercised by Food and Nutrition in choosing a method of computation that complies with the statutory scheme.

## II. Good Cause Waiver

■ Once liability is determined and a sanction derived, the state may seek a penalty waiver pursuant to 7 C.F.R. § 275.-23(d)(5)(i). The state must show good cause for its excessive error rate by proving one or more of the following: (1) natural disasters or civil disorders that adversely affect program operations; (2) strikes by the state staff who determine eligibility and who process changes; (3) significant caseload growth (15 percent) for a six month period; (4) amendments to the federal or state programs that adversely affect management of the program; (5) misapplication of federal policy, erroneously approved by Food and Nutrition; (6) circumstances beyond the state's control; or (7) the state's good faith exemplary efforts to reduce its error rate. 7 C.F.R. §§ 275.-23(e)(5)(A)–(F), 276.6. Congress intended that the Secretary exercise its discretion in determining penalty waivers by weighing the above factors. 1980 U.S.C.C.A.N. at 843, 906. Food and Nutrition may reduce or eliminate the state's liability accordingly. 7 C.F.R. §§ 275.23(e)(5)(F)(ii), 276.6(b).

The standard of judicial review for denial of a penalty waiver appears to be a matter of first impression. This Court must first determine whether Congress, in enacting 7 U.S.C. § 2023, intended that a *de novo* standard apply to judicial review of penalty waiver denials. The Commonwealth asserts that the *de novo* standard applies to all matters before this Court. The federal government replies that the "arbitrary and capricious" standard of the Administrative Procedure Act applies.

This Court first examines the express language of the Act in order to ascertain its plain meaning. *Massachusetts Fin. Serv., Inc. v. Sec. Investor Protection Corp.*, 545 F.2d 754, 756 (1st Cir.1976); *see also United States v. Vest*, 639 F.Supp. 899, 908 (D.Mass.1986), *aff'd* 813 F.2d 477 (1st Cir.1987). In pertinent part, 7 U.S.C. § 2023(a) reads:

> [S]uch information as may be submitted ... as well as such other information as may be available, shall be reviewed by the person or persons designated by the Secretary, who shall, *subject to the right of judicial review hereinafter provided,* make a determination which shall be final.... If the ... State agency feels aggrieved by such final determination, it may obtain judicial review thereof....

(emphasis added). *See* note 6, *supra* (quoting additional relevant language from this sub-section).

■ Surely, a denial of the penalty waiver qualifies as a "final determination" for which the State agency "feels aggrieved." The judicial review to which the Commonwealth is thus entitled would, however, seem to be limited to determining whether the Secretary's denial of a penalty waiver is "arbitrary and capricious." This is the First Circuit's instruction for reviewing sanctions imposed on states in these circumstances. *See, e.g., Broad St.*, 720 F.2d at 220; *Kulkin*, 626 F.2d at 184. The legislative history confirms this view: "none of these [administrative and judicial review] procedures would be applicable to the Secretary's review of ... good cause [for a penalty waiver]." 1980 U.S.C.C.A.N. at 843, 907. This Court rules that Congress did not intend *de novo* review of penalty waivers.[10]

Food and Nutrition denied the Commonwealth's good cause waiver because Massachusetts chronically failed to abide by program deadlines and requirements. *See generally* Declaration of Lynda Silva, Food

---

**10.** This Court cannot conclude, however, that Congress meant for the Secretary to have unfettered, non-reviewable discretion in determining penalty waivers. Only clear and convincing evidence can support such an assumption. *Abbott Lab. v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). Absent any such indication—and there is none here—this Court concludes that judicial review of penalty waiver denials is to take place under the "arbitrary and capricious" standard of review of the Administrative Procedure Act.

and Nutrition Director. Ms. Silva attests that the federal government warned the Commonwealth on several occasions about its failure to implement program requirements properly. Corrective measures in some cases took as long as 17 months, rather than the required 30 days. Silva Declaration ¶¶ 20, 12. Notwithstanding these general program deficiencies, Massachusetts did not work diligently to reduce its error rate, preferring to place its corrective resources into the Aid to Families with Dependent Children program rather than the food stamp program. *Id.* at ¶¶ 74–75.

The Appeals Board affirmed the action of Food and Nutrition in denying the penalty waiver, based on the failure of Massachusetts to exercise exemplary efforts to reduce the error rate.

> It is the Board's considered opinion that all the actions taken by Massachusetts were no greater than are to be expected of a state which is properly managing the food stamp Program. Program managers are continually confronted with growth, caseload shifts, regulatory changes, computer capabilities, budget limitations and operation. The Board finds no particular or unique circumstances in the State's argument regarding problem areas to justify a finding of good cause. Therefore, the full claim made by Food and Nutrition Service remains the State's liability.

Kerchner Letter at 1979.

The Commonwealth does not contest these improprieties, but it asserts that it is nonetheless entitled to a penalty waiver based on: (1) a 15 percent caseload growth; (2) Congressional changes in the food stamp program that adversely affected administration of the program; and (3) the Commonwealth's institution of exemplary corrective measures as a good faith effort at reducing the error rate. *See generally* Declaration of Bruce Goodro, Director of Quality Evaluation at the Department of Public Welfare. The Court will address in turn each of the three factors relied upon by the Commonwealth.

### A. Substantial Caseload Growth

The Secretary recognized that substantial caseload growth could adversely affect administration of the program and, subsequently, the error rate. Fifteen percent growth is the suggested level for a good cause waiver. 7 C.F.R. § 275.23(e)(5)(C). Mr. Goodro asserts that the Massachusetts growth rate was 18 percent during the seven months prior to April 1982.[11] The federal government disputes this conclusion, arguing that the Commonwealth's growth rate is misleading because it is based on Supplemental Security Income "cash-ins" that account for a 13.58 percent growth in a single month, October 1981. Record at 1545.

### B. Adverse Impact of New Programs or Legislation

The Commonwealth next contends that passage of the Omnibus Budget Reconciliation Act of 1981 ("Omnibus Act") adversely affected the state's ability to administer the food stamp program efficiently. Goodro Affidavit ¶¶ 5–6. While the Omnibus Act apparently did cause confusion and errors in assessing reporting and eligibility requirements, and it is true that 7 C.F.R. § 275.23(e)(5)(D) allows a penalty waiver for "changes in the food stamps program or other federal or state programs that have a substantial adverse impact upon management of the state's food stamp Program," the United States responds that the Omnibus Act became effective in December of 1981, a full four months before the penalty period. The United States thus argues that the Commonwealth had plenty of time to work out any alleged glitches.

### C. Good Faith Efforts to Reduce Error Rate

Massachusetts contends that it devised and implemented several programs aimed at reducing its official error rate, including installation of computer terminals, institution of a monthly reporting system, a photo identification program to frustrate fraud,

---

11. Mr. Goodro estimates that the 18 percent growth rate is 20 percent greater than the required 15. Goodro Affidavit ¶ 4. The federal government notes that the applicable period is six months, not seven. Record at 1545.

supervisory review and quality review processes, and issuance of several performance and progress review reports. *See generally* Goodro Affidavit. Mr. Goodro attests that the Massachusetts management people were sincerely committed to reducing the error rate. *Id.* at ¶ 11. The federal government counters that this is all well and good, but that good faith efforts must be exemplary in order to qualify for penalty waiver. 7 C.F.R. § 275.25(d)(5)(G).

The facts alleged by the Commonwealth, though qualifying it for consideration for a waiver, and indeed possibly warranting a waiver, do not entitle it to a waiver as a matter of right. Congress specifically provided the Secretary with discretion to permit or deny waivers after a balancing of the requisite factors. Here, the Appeals Board rendered a reasoned opinion after a full appreciation of the facts and issues. This Court can discern no arbitrary or capricious act by the Appeals Board or Food and Nutrition in denying the penalty waiver. Accordingly, the sanctions are upheld as a proper exercise of statutory authority, and the penalty waiver denial withstands challenge. The motion of the United States for summary judgment regarding the validity of the sampling method is GRANTED, and the Commonwealth's motion for summary judgment as to the denial of the penalty waiver is DENIED.

SO ORDERED.