January 22, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1539

COMMONWEALTH OF MASSACHUSETTS,
DEPARTMENT OF PUBLIC WELFARE,
Plaintiff, Appellant,

v.

SECRETARY OF AGRICULTURE, ET AL.,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Selya, Circuit Judge,

Higginbotham,* Senior Circuit Judge,

and Cyr, Circuit Judge.

Douglas H. Wilkins, Assistant Attorney General, with whom

Scott Harshbarger, Attorney General, was on brief, for appellant.

Arvid E. Roach, II, with whom Virginia G. Watkin, Thomas H.

Odom, and Covington & Burling were on brief, for States of

Alabama, California, Florida, Georgia, Illinois, Kentucky,
Louisiana, Nebraska, Ohio, Oklahoma, West Virginia and Wisconsin,
amici curiae.
Deborah Ruth Kant, Attorney, Civil Division, United States

Department of Justice, with whom Stuart M. Gerson, Assistant

Attorney General, A. John Pappalardo, United States Attorney, and

Barbara C. Biddle, Attorney, Civil Division, were on brief, for

appellees.

*Of the Third Circuit, sitting by designation.

SELYA, Circuit Judge. In federal fiscal year (FY)
SELYA, Circuit Judge.

1982, lasting from October 1, 1981 through September 30, 1982,

the Commonwealth of Massachusetts distributed food stamps far

exceeding the margin of error allowable under applicable federal

regulations. Consequently, Food and Nutrition Service (FNS), the

branch of the United States Department of Agriculture responsible

for overseeing the food stamp program, imposed a punitive

sanction.

Massachusetts unsuccessfully appealed the sanction to

the Food Stamp Appeal Board (the Board). It then sought judicial

review in federal district court. See 7 U.S.C. 2023 (1982).

The court granted summary judgment in favor of the defendants,1

albeit in two steps. See Massachusetts v. United States, 737 F.

Supp. 120 (D. Mass. 1990) (Massachusetts I); Massachusetts v.

United States, 788 F. Supp. 1267 (D. Mass. 1992) (Massachusetts

II).

Finding the penalty hard to swallow, the Commonwealth

serves up a gallimaufry of issues for appellate mastication.

Although these issues contain some food for thought, they lack

true nutritive value. Consequently, we affirm the judgment

below.

I. FACTUAL PRELUDE

Congress designed the Food Stamp Act of 1964, Pub. L.

1The Commonwealth named a host of federal defendants in its
suit, including the United States, the Secretary of Agriculture,
the Department of Agriculture, the Board, and FNS. For ease in
reference, we treat the appeal as if the appellees were a single
entity.

2

No. 88-525, 78 Stat. 103 (1964), codified as amended, 7 U.S.C.

2011-2030 (1982), to provide low-income families with access to

government-subsidized foodstuffs. Although the coupons were

actually disbursed by the participating states, FNS paid fifty

percent of the administrative costs and one hundred percent of

the food subsidy costs. In time, the federal government's

generosity produced an unfortunate side effect; because

overpayments were charged to the federal tab, states had little

incentive to keep distributions in line. To curb this

profligacy, Congress eventually enacted a quality control program

(QCP) to ensure more accurate food stamp distribution. The first

QCP took effect in 1977. Pub. L. No. 95-113, 16, 91 Stat. 976

(1977).

From that point forward, Congress persistently tinkered

with the QCP's features. During FY 1982, the QCP required that

each state survey a sample of its food stamp cases in order to

estimate in what percentage of them it had distributed the wrong

number of food stamps. After receiving the states' tallies, FNS

would set a target error rate (the TER), take a subsample of each

state's cases, recheck them for errors, and employ regression

analysis to blend the federal and state estimates of state error

rates into a single estimated error rate (the EER) for the state.

See 7 U.S.C.A. 2025(g) (West Supp. 1981); 94 Stat. 363 (1980);

see also 7 C.F.R. 275.25(d)(6) (1982). If the state's EER

surpassed the TER, as determined by FNS, the federal government

3

imposed a monetary sanction.2 Such fines were calculated by

multiplying the total dollar value of state-issued food stamps

for the fiscal year times the difference between the state's EER

and its TER. See 7 C.F.R. 275.25(d)(3) (1982). If, however,

the state's EER was below five percent, the state received a

bonus: the federal government increased its contribution to the

program's administrative costs from fifty percent to sixty

percent. See 7 C.F.R. 275.25(c)(2)(i) (1982).

In FY 1982, FNS set Massachusetts's TER at 14.88

percent. After the two sovereigns completed their sampling and

resolved some mathematical bevues by negotiation, FNS figured the

EER to be roughly 16.35 percent and, accordingly, fined the

Commonwealth $1,323,864. The penalty survived scrutiny by both

the Board and the district court.

In this appeal, Massachusetts makes four principal

claims: (1) that the quality control provisions on which the

sanction rested were no longer in effect when FNS imposed the

sanction; (2) that FNS's sampling methodology was so biased as to

offend the Food Stamp Act; (3) that FNS's use of too large a

sample skewed the results; and (4) that FNS erred in refusing to

grant a good-cause waiver. We treat these asseverations in

sequence.

II. LACK OF STATUTORY AUTHORITY

Massachusetts and the amici join in urging that FNS had

2We discuss infra Part IV the circumstances in which the

imposition of a monetary sanction might be waived.

4

no authority to levy sanctions for FY 1982 because Congress

repealed the QCP effective October 1, 1982. This claim stems

from passage of the Omnibus Budget Reconciliation Act (OBRA),

Pub. L. No. 97-253, 96 Stat. 763 (1982), enacted in September of

1982. OBRA completely revamped the Food Stamp Act's approach to

quality control. The legislation repealed the previously

existing QCP and fashioned a new regimen effective October 1,

1982 (the first day of FY 1983). Massachusetts contends that

this legislative legerdemain undermined FNS's authority

thereafter to impose sanctions for FY 1982.3

It is a hoary rule of the common law that the repeal of

a statute eliminates any inchoate liability for penalties under

the repealed statute. See, e.g., United States v. Reisinger, 128

U.S. 398, 401 (1888). In order to ameliorate this rule, Congress

passed a general savings statute providing in pertinent part that

the "repeal of any statute shall not have the effect to release

or extinguish any penalty, forfeiture, or liability incurred

under such statute . . . ." 1 U.S.C. 109 (1982). On its face,

section 109 seems adequate to preserve the authority by which FNS

purposed to sanction the Commonwealth.

In an effort to escape the savings statute's web,

Massachusetts notes that the QCP allowed waivers of liability

3Since we can find no indication in the record that
Massachusetts raised this issue before the Board, the point is at
least arguably waived. But, because the issue goes to the
Board's jurisdiction and because the appellees have not advanced
a claim of waiver, we choose to address it, notwithstanding the
possible incidence of procedural default.

5

premised on subsequent corrective measures. See, e.g., 7 C.F.R.

275.25(d)(5) (1982). From this datum, Massachusetts deduces

that it could not have "incurred" liability until such a waiver

was denied an event which took place well after October 1,

1982. The court below found this argument unpersuasive. See

Massachusetts II, 788 F. Supp. at 1269 n.3. So do we. The mere

fact that Congress grants an agent the power to waive sanctions

does not turn back the clock and eradicate the reality of the

underlying violation. Thus, we do not believe Congress intended

that liability would be deemed "incurred" under federal law, 1

U.S.C. 109, only when all opportunities for special

dispensations had been exhausted and a previously imposed penalty

had become irreversible. See, e.g., Standard Oil Co. v. Federal

Energy Admin., 612 F.2d 1291, 1294 n.3 (Temp. Emer. Ct. App.

1979) (explaining why costs should be deemed "incurred" even

before the amount has become certain). Rather, we think Congress

intended that states incur liability for their food stamp errors

at the conclusion of the six-month monitoring period, 7 U.S.C.A.

2025(g)(1) (West Supp. 1981) a period which, in this case,

ended September 30, 1982.

We have two main reasons for interpreting the interface

between the Food Stamp Act and the savings statute in this way.

In the first place, it appears well established that the savings

statute was designed to prevent exactly the sort of lapse that

Massachusetts argues occurred here. See, e.g., Hamm v. City of

Rock Hill, 379 U.S. 306, 314 (1964) ("The federal saving statute

6

. . . was meant to obviate mere technical abatement such as . . .

a substitution of a new statute with a greater schedule of

penalties . . . ."); United States v. Holley, 818 F.2d 351, 353

(5th Cir. 1987) (similar). Reading the savings statute to

release from liability any party who had not yet exhausted after-

the-fact remediation would hamper the law's goal, contravene the

Supreme Court's longstanding interpretation of how the statute

should be applied, and encourage violators to petition willy-

nilly for discretionary administrative relief in the hope that

the statutory scheme might be changed betweentimes.

In the second place, the statutory structure predicates

waiver on precedent liability. See 7 U.S.C.A. 2025(g)(1) (West

Supp. 1981) (providing that, under the Food Stamp Act's liability

program, an offending state shall pay the imposed fine unless the

Secretary determines that good cause exists for waiver). We do

not think Congress placed the cart to the horse's rear by

accident. Had Congress wished waiver considerations to be part

and parcel of a liability determination, it would simply have

written the Food Stamp Act to premise liability on the absence of

those factors that allow the granting of good-cause waivers.

Congress chose to structure the statute differently, however, and

we must honor its bipartite design in our interpretation. See,

e.g., Ingersoll-Rand Co. v. McClendon, 111 S. Ct. 478, 482

(1990); Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 824

(1st Cir. 1992), cert. denied, 61 U.S.L.W. 3478 (U.S. 1993).

We note, too, that legislative statements surrounding

7

the 1982 repeal of the QCP, while admittedly less than pellucid,

indicate no discernable intent to exonerate states for pre-1983

administrative errors. Quite the opposite: the legislative

history suggests Congress intended to increase the certainty of

penalties beginning with FY 1983. See S. Rep. No. 504, 97th

Cong., 2d Sess. 70-71, reprinted in 1982 U.S.C.C.A.N. 1641, 1708-

09:

[T]he . . . major flaw in the existing system
[is that] [t]he current penalty . . . has
proven difficult to apply in practice because
of the relatively large amounts involved and,
as a result, the Secretary has [frequently]
chosen to waive its application. The
sanctions established [by the new statute] .
. . should not be waived except when unusual
circumstances intervene.

Given this purpose, it seems unlikely that Congress intended the

1982 repeal to preclude enforcement of the earlier regulations

for 1981 and 1982 in instances where good-cause reviews were

imminent or ongoing, but had not yet been decided.

For these reasons, we reject the Commonwealth's claim

that FNS lacked statutory authority to impose the sanctions in

question.

III. STATISTICAL METHODOLOGY

Having confirmed the vitality of the sanction

provision, we turn next to the Commonwealth's double-jointed

challenge to the statistical methodology that FNS employed.

Before reaching Massachusetts's two substantive arguments, we

think it is useful to explicate the applicable standard of

judicial review.

8

A. Standard of Review.

The Food Stamp Act provides for de novo review of final

administrative determinations in the district court.4 However,

this searching standard is restricted to liability

determinations. See Broad St. Food Mkt., Inc. v. United States,

720 F.2d 217, 220 (1st Cir. 1983); Collazo v. United States, 668

F.2d 60, 65 (1st Cir. 1981). It does not spill over to penalty

determinations. See Kulkin v. Bergland, 626 F.2d 181, 184 (1st

Cir. 1980) (holding that, under the Food Stamp Act,

"administrative remedies or sanctions are subject to a very

limited judicial review"). A court scrutinizing administrative

remedies or sanctions imposed under the Food Stamp Act may only

overturn those actions that appear arbitrary, capricious, or

contrary to law. See Haskell v. United States Dep't of Agric.,

930 F.2d 816, 820 (10th Cir. 1991); Woodard v. United States, 725

F.2d 1072, 1077-78 (6th Cir. 1984); Broad St., 720 F.2d at 219-

21; Hough v. United States Dep't of Agric., 707 F.2d 866, 869

(5th Cir. 1983); Kulkin, 626 F.2d at 184-85.

To be sure, both Broad St. and Kulkin involved (1)

4The statute provides in pertinent part:

[A] State agency . . . may obtain judicial
review [of a final administrative
determination] by filing a complaint against
the United States in the United States court
for the district in which it resides or is
engaged in business . . . . The suit . . .
shall be a trial de novo by the court in
which the court shall determine the validity
ofthe questionedadministrativeaction inissue.

7 U.S.C. 2023(a) (1982).

9

factual findings anent the culpability of food store owners who

accepted food stamps as compensation for prohibited goods, and

(2) determinations about what sanctions were condign, given the

identities of the violators and the nature of the violations.

See Broad St., 720 F.2d at 219; Kulkin, 626 F.2d at 182-83. The

question in the instant case is more complex because the two

parts of the calculus liability and sanctions are imbricated:

FNS's determination that Massachusetts's EER was unacceptably

high essentially determined both the Commonwealth's liability and

the amount of the resultant sanction. See 7 C.F.R.

275.25(d)(3) (1982) (explicated supra pp. 3-4).

Notwithstanding this conflation of liability and

remediation, a reviewing court's path remains clear. Where

liability is at issue, section 2023(a) requires that courts

review administrative determinations de novo. If this statutory

bedrock is to endure, inexorably mixed issues of liability and

sanctions must likewise be assessed de novo, even if such a

penetrating standard of judicial review intrudes to some extent

into agency decisionmaking in the sanctions area. Thus, insofar

as the Commonwealth's assignments of error implicate the validity

of the EER and, therefore, the amount of the penalty levied,

plenary review is indicated.

We are quick to remark, however, that de novo review in

cases of this genre does not give courts an entirely free hand.

Where, as here, the issues before the court are legal in nature,

de novo review of an administrative matter does not mean that the

10

district court must devise an entirely new regulatory scheme.

Rather, in respect to liability issues, the court must ensure

that the agency has followed its own regulations and that those

regulations do not exceed the scope of the agency's mandate.

With these precepts in mind, we now address the Commonwealth's

statistical arguments.5

B. Statistical Bias.

In order to estimate Massachusetts's food stamp error

rate and thereby determine what (if any) sanction might be

appropriate, FNS sampled 194 of the Commonwealth's cases for

compliance. Massachusetts and the amici urge that the appellees'

sampling methodology is unlawful because the risk of error

inherent in FNS's approximation is not evenly shared between the

state and the federal government. Because FNS's statistical

method effectively determines the Commonwealth's liability as

well as the amount of the sanction to be imposed, our review of

the statistical bias claim is plenary.

We start with the obvious: FNS's sampling is no

different than any other statistical sampling in that it cannot

produce results that reflect the actual error rate with unerring

accuracy. Thus, whatever sampling technique is used, the EER

5Because the court of appeals and the district court are
constrained to apply exactly the same standards of judicial
review in these situations, we cede no deference to the district
court's views. See Lloyd v. Georgia Gulf Corp., 961 F.2d 1190,

1193 (5th Cir. 1992); Terry A. Lambert Plumbing, Inc. v. Western

Sec. Bank, 934 F.2d 976, 979 (8th Cir. 1991).

11

will sometimes underestimate and sometimes overestimate a state's

actual error rate. Massachusetts recognizes this fact of

statistical life but complains that it must foot the bill for

overestimations by paying sanctions although if underestimations

occur it reaps no corresponding benefit (e.g., credits that could

be used to offset future penalties). As a matter of pure

mathematics, the Commonwealth's theory appears to hold water.

Under the federal scheme, the risk of error causes the penalty

provision to weigh more heavily on the states than on the federal

government.6 Nonetheless, we do not see how this circumstance

renders the scheme unlawful.

The Food Stamp Act provides that a state is liable for

"the dollar value equivalent of the State agency's payment error

rate, as determined by the Secretary," to the extent it exceeds

the higher of the national payment rate or the state error

payment rate minus the national rate of error reduction. 7

U.S.C.A. 2025(g) (West Supp. 1981). There are a number of

mechanisms by which FNS could implement this statutory directive,

each with incumbent advantages and disadvantages. Massachusetts

suggests that this court's right to review liability

determinations de novo leaves us free to rethink the regulatory

choice among these various options.

We do not agree. The power of plenary judicial review

6Of course, the states profit from a similar bias when FNS
awards bonuses for lower error rates. In that instance, the
federal government bears the cost of underestimating state error
rates but gains no offsetting advantage from overestimates.

12

does not obviate the devoir of persuasion in a food stamp case in

which a plaintiff challenges the validity of the regulatory

mosaic. See Kulkin, 626 F.2d at 183. To carry its burden, the

plaintiff must still show that the federal agency exceeded its

statutory or constitutional authority. An attempt to make such a

showing must frankly recognize that the art of regulation

involves line-drawing. When Congress entrusts an agency with the

responsibility for drawing lines, and the agency exercises that

authority in a reasonable way, neither the fact that there are

other possible places at which the line could be drawn nor the

fact that the administrative scheme might occasionally operate

unfairly from a particular participant's perspective is

sufficient, standing alone, to undermine the scheme's legality.

See Knebel v. Hein, 429 U.S. 288, 294 (1977) (holding that the

availability of more equitable food stamp regulations does not

render the Secretary's particular regulatory scheme invalid);

Louisiana v. Black, 694 F.2d 430, 431-32 (5th Cir. 1982) (same);

see also Chevron U.S.A. Inc. v. Natural Resources Defense

Council, Inc., 467 U.S. 837, 843 n.11 (1984) ("The court need not

conclude that the agency construction was the only one it

permissibly could have adopted . . . to uphold [it] . . . .")

(collecting cases); Mourning v. Family Publications Serv., Inc.,

411 U.S. 356, 371 (1973) ("That some other remedial provision

might be preferable is irrelevant."). In other words, so long as

the administrative scheme is a valid exercise of the agency's

authority, whether or not a perfect exercise of that authority,

13

the courts must honor it. See Sprandel v. Secretary of HHS, 838

F.2d 23, 27 (1st Cir. 1988) (per curiam) (observing that where

administrative line-drawing is involved, "there are no perfect

solutions").

These principles are dispositive here. Massachusetts

argues, in effect, that a system of credits and debits for each

state would be preferable to, and fairer than, the statistical

methodology selected by FNS. Whether or not this is so, the

Commonwealth has not demonstrated that the system selected by FNS

is an irrational one, that it is arbitrarily conceived, that it

is profoundly flawed, or that it operates in a wholly capricious

manner. Congress directed that the error rate was to be

"determined by the Secretary," 7 U.S.C.A. 2025(g) (West Supp.

1981), and the Secretary implemented this directive through the

application of what all parties agree is routine statistical

sampling. The enabling statute itself sets out the arithmetic

mechanism for determining the sanction, given the error rate; the

Secretary has followed this command, albeit without refining his

statistical estimates. The Secretary might, as Massachusetts

advocates, have installed a more intricate and sensitive

statistical system, but doing so would not necessarily have

represented an improvement. The proposed alternatives would by

all accounts be more complicated to administer and could well

prove less of a deterrent to administrative errors.

In terms of our analogy, the line drawn by FNS, as the

Secretary's designee, seems to have been plotted sensibly, if not

14

with perfect precision; that is, FNS chose a configuration

consistent with statutory imperatives and well within the

universe of plausible approaches. Because the administrative

scheme did not exceed the agency's statutory discretion, summary

judgment was properly granted on this issue. See Valley Citizens

for a Safe Env't v. Aldridge, 886 F.2d 458, 469 (1st Cir. 1989)

(finding that reasonableness of agency action supported summary

judgment); Kulkin, 626 F.2d at 183 (upholding summary judgment

where the disputed facts were immaterial to the plaintiff's

ultimate burden at trial).

C. Oversampling.

The Commonwealth also asserts that FNS violated its own

regulations when it took a subsample comprised of 194 food stamp

cases (as opposed to the 180 cases specified in 7 C.F.R.

275.3(c)(1) (1982)). The district court, while noting that

Massachusetts had not raised the issue before the Board, see

Massachusetts I, 737 F. Supp. at 122 n.3, reached the merits and

ruled that the regulations, while mentioning 180 cases, did not

set a maximum subsample size. Id. at 127. For our part, we see

no reason to delve behind the Commonwealth's procedural

default.7 Accordingly, we hold that Massachusetts, by

7Our inquiry into procedural default has been hindered by
the Commonwealth's failure to follow Fed. R. App. P. 30(d) and
include an index in its appendix of excerpts from the
administrative record. This failure is exacerbated by other
shortcomings in the main appendix: various pages are missing,
illegible, and/or out of sequence. It is, of course, an
appellant's obligation "to provide this court with an appendix
sufficient to support its points on appeal." United States v.

One Motor Yacht Named Mercury, 527 F.2d 1112, 1113 (1st Cir.

15

neglecting to raise this claim before the Board, waived any right

to object to the sample size.8

In the usual administrative law case, a court ought not

to consider points which were not seasonably raised before the

agency. See United States v. L. A. Tucker Truck Lines, Inc., 344

U.S. 33, 37 (1952) (discussing the "general rule that courts

should not topple over administrative decisions unless the

administrative body . . . has erred against objection made at the

time appropriate under its practice"); Khalaf v. Immigration &

Naturalization Serv., 909 F.2d 589, 592 (1st Cir. 1990)

(explaining that issues not raised before an administrative

appeal board cannot be adjudicated in the course of judicial

review); Removatron Int'l Corp. v. FTC, 884 F.2d 1489, 1493-94

(1st Cir. 1989); Colin K. v. Schmidt, 715 F.2d 1, 5-6 (1st Cir.

1983).

The doctrine of procedural default in the

administrative context is analogous to the established rule that

appellate courts will not entertain arguments which could have

1975). When, as now, an appellant shirks this duty, it must bear
the onus of any insufficiencies in the record on appeal,
including inadequacies in the appendix.

8The parties have characterized the Commonwealth's failure
to raise the oversampling issue as an "exhaustion" problem. We
do not view it in that light. Administrative exhaustion and
waiver can be concurrent concepts at times, see IV Kenneth C.

Davis, Administrative Law Treatise 26:7 (1983), but they are

not synonymous here. Because the Board's decision was final and
reviewable by the district court, we believe that Massachusetts
exhausted its administrative remedies. See, e.g., Athehortua-

Vanegas v. Immigration & Naturalization Serv., 876 F.2d 238, 240

(1st Cir. 1989).

16

been, but were not, raised in the trial court. See, e.g.,

Clauson v. Smith, 823 F.2d 660, 666 (1st Cir. 1987) (collecting

cases). As in the trial court/appellate court analogy, requiring

parties to develop their arguments in the administrative setting

before seeking judicial review serves several salutary purposes.

We list three such purposes that have direct bearing in this

instance.

First, when the administrative agency is given an

opportunity to address a party's objections, it can apply its

expertise, exercise its informed discretion, and create a more

finely tuned record for judicial review. By way of illustration,

if Massachusetts had appropriately raised the oversampling issue

in this case, we would now have the benefit of both the Board's

interpretation of the applicable regulations and its expert

opinion concerning the ultimate effect of the augmented sample

size. Though different administrative conclusions deserve

different degrees of deference, it is essential to the proper

development of administrative law that courts exercise their

function of judicial review on a well-rounded record. See McKart

v. United States, 395 U.S. 185, 194 (1969); see also Valley

Citizens, 886 F.2d at 469 (observing that "the place to attack

standard methodology, at least in the first instance, is before

the agency, not before a reviewing court").

A second reason for applying strict rules of procedural

default in the administrative context is to promote judicial

economy. A claim seasonably presented to the appropriate

17

administrative body has an appreciable chance of being put to

rest, or at least narrowed, before it depletes the heavily

burdened resources of the federal courts. Massachusetts, the

amici, and the court below all relate previous instances where

there were problems with sample sizes and, consequently, the

Board overturned FNS sanctions. See, e.g., Massachusetts I, 737

F. Supp. at 122. Thus, raising the issue before the Board might

well have led to its resolution, once and for all.

Finally, enforcing procedural default solidifies the

agency's autonomy by allowing it the opportunity to monitor its

own mistakes and by ensuring that regulated parties do not simply

turn to the courts as a tribunal of first resort. A double

whammy would result if Article III judges encouraged such end

runs by demonstrating a willingness to hear all challenges to

regulatory action regardless of whether the parties raised those

challenges before the affected agency: power would drain from

the agencies and administrative appeals would flood the federal

courts.

To be sure, there are exceptional circumstances under

which a court might dispense with the raise-or-waive rule in the

administrative law context. Cf., e.g., United States v. La

Guardia, 902 F.2d 1010, 1012-13 (1st Cir. 1990) (explaining why,

in a criminal case, the court of appeals would exercise its

discretion to review a particular constitutional claim that had

not been raised in the trial court). As a general matter,

however, courts will not entertain an issue that the parties

18

failed to raise in the proper administrative venue unless the

issue is jurisdictional in nature or some other compelling reason

exists. See Tucker Truck Lines, 344 U.S. at 38; Rana v. United

States, 812 F.2d 887, 889-90 & n.2 (4th Cir. 1987). The

Commonwealth tenders no such justification here.

Whether FNS appropriately followed its own regulations

in regard to sampling, and the effect and consequences of any

failure to do so, are matters which in no way implicate

jurisdictional concerns. On the contrary, they present the sort

of problems routinely within the Board's purview and at the heart

of its expertise. The Commonwealth has advanced no palatable

excuse for failing to raise the oversampling issue at the proper

time and in the proper forum. Under these circumstances, we

cannot justify any relaxation of the customary rule. The

Commonwealth waived the oversampling issue.9

IV. GOOD-CAUSE WAIVERS

Massachusetts argues that it was entitled to a good-

cause waiver as a matter of right and that the district court

erred in summarily rejecting its beseechment. We do not agree.

Unlike questions of statistical propriety, see supra

Part III, the matter of a good-cause waiver is not imbricated

9Incident to this procedural default is the Commonwealth's
quest for reversal on the ground of inconsistent administrative
positions. But here, the Commonwealth is hoist with its own
petard. It did not bring the oversampling issue before the
Board, thus depriving the Board of the chance to explore the
issue in a zoetic context informed by both case-specific facts
and administrative precedents. Because we cannot judge the
Board's consistency on an issue it did not adjudicate, we deem
this related claim to be waived as well.

19

with a fundamental determination of liability but relates solely

to FNS's determination of the appropriate sanction. Thus, the

Food Stamp Act's provision for de novo review of liability

findings does not apply.10 Instead, we review the waiver

denial to see whether it was arbitrary, capricious, or contrary

to law. Broad St., 720 F.2d at 220; Kulkin, 626 F.2d at 184. In

so doing, we recognize that an administrative agency enjoys great

latitude to interpret its own rules as long as those

interpretations are reasonable. See Martin v. Occupational

Safety & Health Rev. Comm'n, 111 S. Ct. 1170, 1175-76 (1991)

(explaining that an "agency's construction of its own regulations

is entitled to substantial deference") (quoting Lyng v. Payne,

476 U.S. 926, 939 (1986)); accord Udall v. Tallman, 380 U.S. 1,

16-17 (1965); Federal Labor Relations Auth. v. United States

Dep't of the Navy, 941 F.2d 49, 59 (1st Cir. 1991); Dunn v.

Secretary of United States Dep't of Agric., 921 F.2d 365, 366-67,

369 (1st Cir. 1990).

10Indeed, the legislative history reveals that Congress
explicitly rejected the de novo judicial review that

Massachusetts would have us indulge on this issue:

Every State against which the Secretary
asserted a claim would have the right to seek
administrative and judicial review of the
claim in accordance with the procedures
contained in section 14 of the Act. None of
these procedures would be applicable to the
Secretary's review of the State's contention
that it had good cause for its failure to
meet the appropriate level of error.

H.R. Rep. No. 788, 96th Cong., 2d Sess. 74 (1980), reprinted in

1980 U.S.C.C.A.N. 843, 907.

20

It is in the Secretary's realm to grant or deny a good-

cause waiver.11 See 7 U.S.C.A. 2025(g) (West Supp. 1981).

To obtain such a waiver, a state must show, at a bare minimum,

that one of the following events occurred: (1) natural

disasters, civil disorders, labor unrest, or other circumstances

beyond the state's control, adversely affecting program

operations; (2) significant caseload growth; (3) legislative

changes adversely affecting program management; (4)

misapplication of federal policy with erroneous approval from

FNS; or (5) exemplary efforts to reduce the error rate. See 7

C.F.R. 275.25(d)(5)(A)-(G). Whereas a threshold showing along

these lines may qualify a state for a good-cause waiver, the

Secretary can still deny the waiver if he finds the state's

showing insufficient either because other factors overshadow the

applicant's compendium of exculpatory factors or because a

particular event or events listed by the applicant cannot

withstand objective scrutiny.12 Id.

Massachusetts sought a good-cause waiver on three

grounds, viz., caseload growth, changes in federal laws, and good

11The Secretary has delegated this power to FNS. See 7

C.F.R. 275.25(d)(5) (1982).

12The regulations also provide for an "automatic" waiver in
certain limited circumstances. See 7 C.F.R. 275.25(d)(5)(G)

(1982). In order to receive such a waiver, a state must have
implemented an FNS-approved corrective action program in the six
months before the period during which the excessive error rate
materialized, and must meet specially reduced target error rates
thereafter. The record does not indicate that Massachusetts ever
claimed eligibility for an automatic waiver applicable to FY
1982.

21

faith efforts to reduce its error rate. FNS denied the waiver.

In so doing, it took much of the wind from Massachusetts's sails.

Specifically, FNS explained that Massachusetts's caseload growth

was not a sufficient excusatory fact because the figure was

bloated by one-time social security "cash-ins"; that new

legislation was not a factor because the state had four months to

adapt to changes in the law; and that Massachusetts's efforts to

reduce errors were anything but "exemplary." Additionally, FNS

brought an independent set of considerations to bear, stressing

the Commonwealth's steady history of failing to meet program

deadlines and requirements. The Board approved the agency's

decision to withhold a waiver on this ground and the district

court affirmed by summary judgment.

Massachusetts and FNS attempt to rejoin this point-

counterpoint before us. Our role in this setting, however, is

not to weigh the factual averments and assess, on balance, the

merits of a waiver. Rather, "[i]f the court upholds the agency's

finding of violation, the court's only remaining task is to

examine the sanction imposed in light of the administrative

record to judge whether the agency properly applied its

regulations . . . ." Broad St., 720 F.2d at 220. In fine, a

reviewing court may only overturn agency sanction determinations

that are arbitrary and capricious, see id., which is to say,

"unwarranted in law . . . or without justification in fact."

Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185-86 (1973)

(citation omitted); accord Collazo, 668 F.2d at 65.

22

In the posture of this case, the idiosyncratic nature

of summary judgment practice gives a slightly different twist to

the operation of the familiar "arbitrary-and-capricious"

standard. Because we are scrutinizing the district court's

disposition of a motion filed under Fed. R. Civ. P. 56(c), we

must approach the record "in the light most hospitable to the

party opposing summary judgment, indulging all reasonable

inferences in that party's favor." Griggs-Ryan v. Smith, 904

F.2d 112, 115 (1st Cir. 1990). In order to prevail, therefore,

the Commonwealth must persuade us that the record evinces a

genuine dispute over some material fact. Emphasizing the items

set forth in support of its waiver application, Massachusetts

says that such a dispute existed. But, this perspective

overlooks the relevant point: the real question is not whether

the facts set forth in support of the waiver application are

disputed, but, rather, whether the administrative record, now

closed, reflects a sufficient dispute concerning the factual

predicate on which FNS relied in denying the waiver to support a

finding that the agency acted arbitrarily or capriciously. We

explain briefly.

On a motion for summary judgment, a fact is material if

it "might affect the outcome of the suit under the governing

law"; a dispute is "genuine" if a reasonable jury could resolve

it in favor of the nonmoving party. United States v. One Parcel

of Real Property, Etc., 960 F.2d 200, 204 (1st Cir. 1992) (citing

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

23

Because the law allows FNS to exercise discretion as long as it

has minimally adequate justification in fact for doing so, the

facts material to the propriety of summary judgment on the good-

cause waiver question are those facts that relate to whether

FNS's denial of the waiver was arbitrary and capricious not the

facts on which a plea for issuance of a waiver might have rested.

See Villanueva v. Wellesley College, 930 F.2d 124, 129 (1st Cir.)

(noting that an appellate tribunal must review summary judgment

in light of the plaintiff's ultimate burden at trial), cert.

denied, 112 S. Ct. 181 (1991). In a nutshell, then, a bona fide

skirmish over the veracity and importance of ancillary facts

which the Commonwealth thinks support its waiver application does

not egest the possibility of summary judgment, for it is the

basis underlying the agency's denial of a waiver upon which a

reviewing court must focus. See Town of Norfolk v. United States

Army Corps of Eng'rs, 968 F.2d 1438, 1448 (1st Cir. 1992)

(upholding a grant of summary judgment on the basis that, if an

agency determination is "reasonably supported by the

administrative record, [a reviewing court's] inquiry must end");

see also Villanueva, 930 F.2d at 131 (ruling that summary

judgment is proper when a plaintiff disputes some facts, but does

not adduce sufficient evidence from which the trier could

conclude that the defendant failed to meet the applicable legal

standard).

The district court noted that the facts upon which the

Commonwealth relied, "though qualifying it for consideration for

24

a waiver, and indeed possibly warranting a waiver, [did] not

entitle it to a waiver as a matter of right." Massachusetts II,

788 F. Supp. at 1275. We agree with this assessment. We add,

moreover, that, as this court has recognized for many years,

simply rearguing the merits of an agency's discretionary decision

will not forestall summary judgment on such an issue. See, e.g.,

Concerned Citizens on I-190 v. Secretary of Transp., 641 F.2d 1,

7 (1st Cir. 1981). Although we, like the district court, assume

for argument's sake that the subsidiary facts on which the

Commonwealth's waiver application rested are true, the record

nevertheless reveals that FNS weighed these facts against, and

eventually based its denial on, other uncontested facts (e.g.,

the contribution of Social Security "cash-ins" to caseload

growth, the superior performance of other states under much the

same circumstances, and Massachusetts's checkered history of

noncompliance with food stamp program directives). Regarding

this latter set of subsidiary facts, there is no dispute. See

Massachusetts II, 788 F. Supp. at 1274.

Let us be perfectly clear. We do not suggest that

courts should rubber-stamp agency decisions under the guise of

"arbitrary-and-capricious" review. Had FNS, in this case,

rejected the waiver application on a ground that its regulations

did not contemplate, or without considering the applicant's

stated basis for relief, or in reliance on a manifestly

inadequate factual showing, there might well be room for a court

to find the agency's actions arbitrary and capricious. But,

25

nothing of the kind transpired here. Rather, the record reveals

a situation in which FNS carefully considered the whole and

declined rationally, if not inevitably to grant discretionary

relief.

In the final analysis, Congress elected to delegate the

discretion to award or withhold good-cause waivers of food stamp

penalties to the Secretary not to the federal courts. Where,

as here, the legislature has conferred generous discretion upon

an agency, a reviewing court must contemplate the administrative

record with due regard for that discretion and gauge the

reasonableness of agency action in that light. Given the low

quantum of factual justification necessary to deny a

discretionary waiver under section 2025(g), we are constrained to

conclude that, since FNS's denial of the waiver was based upon a

plausible and essentially uncontested set of reasons documented

in the record and consistent with existing regulations, the

district court correctly ruled in its favor, notwithstanding that

the case was at the summary judgment stage. See Valley Citizens,

886 F.2d at 469; see also Citizens to Preserve Overton Park, Inc.

v. Volpe, 401 U.S. 402, 416 (1971) ("The Court is not empowered

to substitute its judgment for that of the agency.").

V. CONCLUSION

We need go no further. The Commonwealth's

asseverational array announces an abundance of red meat and

strong drink; yet, its table is spread with far less hearty fare.

Because appellant's arguments afford scant sustenance for its

26

position, the disputed sanction must stand. On the record before

it, the district court did not err in entering summary judgment

in favor of the Secretary.

Affirmed.
Affirmed

27